Filed 7/28/26  P. v. Orduno CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>SANTOS ORDUNO,<br><br>　　Defendant and Appellant. | B340740<br><br>Los Angeles County<br>Super. Ct. No. BA486690 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark Hanasono, Judge.  Affirmed.

Judith Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield and Chelsea Zaragoza, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Santos Orduno retained private counsel to defend him against murder, attempted murder, and burglary charges. Over two years later, immediately before jury selection and the beginning of trial, Orduno requested to discharge private counsel and represent himself. The following day, Orduno clarified that he wished to discharge his private counsel and be defended by court-appointed counsel. The trial court denied these requests as untimely, and the jury convicted Orduno of the charged offenses. On appeal, Orduno argues the trial court erred by denying his requests. We affirm.

## PROCEDURAL BACKGROUND

In February 2023, the jury convicted Orduno of murder (Pen. Code, § 187, subd. (a))[1], attempted murder (§§ 187, subd. (a), 664), and first degree burglary. The jury found not true allegations that Orduno personally and intentionally discharged a firearm causing great bodily injury in the commission of the murder and attempted murder. (§ 12022.53, subd. (d).) The trial court sentenced Orduno to an indeterminate term of 32 years to life plus a determinate term of 2 years in state prison. Orduno timely appealed.

## FACTUAL BACKGROUND

**Prosecution case**

Michigan Criminal Force and Primera Flats are rival gangs whose territories border each other. Orduno had ties to the Primera Flats gang. Three of his brothers are Primera Flats gang members, and he lived within the gang's territory a couple blocks from where the shooting that gave rise to this case occurred. In 2019, he acted as a lookout while another individual

---

[1] Future statutory references are to the Penal Code.

tagged "Primera Flats." Orduno's gang moniker was "Roz," and that moniker had been tagged near his home.

Around 11:00 p.m. on April 15, 2020, Leopoldo Monarrez and Jesus "Jesse" Martinez, Michigan Criminal Force gang members, were barbequing at a Boyle Heights apartment. Two men wearing face masks walked toward Monarrez and Martinez. One of the men was armed with a firearm, and he started shooting. Monarrez was shot once in the buttocks, and Martinez was shot through his torso and out his back. After receiving medical treatment, Martinez died from the gunshot wound to his torso.

Two Los Angeles Police Department officers were driving nearby and heard the gunshots. As the officers approached the intersection of the shooting, they saw two individuals wearing face masks running in their direction, one of whom was holding a handgun. The officers fired at the men, but the men kept running. The officers also saw two other men on the ground who appeared to have been shot. The officers could not positively identify Orduno because he and the other suspect were wearing facemasks.

After the shooting, Orduno broke into Elvis Hernandez's apartment while Hernandez was asleep. Orduno left his shoes and hat and took Hernandez's pants, jacket, wallet, and work boots.

Officers immediately canvassed the area for video footage. A homeowner shared video surveillance footage that depicted one suspect jumping a wall next to the homeowner's residence and walking along the side of his property. A gang officer who had interacted with Orduno a year prior saw a still photo of the suspect in the video and believed it was Orduno.

3

During a search of the area, a K-9 dog located Orduno on the roof of a parking structure. Once he was located, Orduno jumped from the parking structure to a shipping container and onto a roof. An officer talked to Orduno for about 30 to 35 minutes, then Orduno came down and was arrested around 3:00 a.m. Orduno had Hernandez's identification cards and a "COVID mask."

Officers found a Springfield Armory semiautomatic nine-millimeter Luger behind a folding table in the yard of the home Orduno had jumped from. The firearm contained an empty magazine. The DNA on the firearm and magazine produced low-level samples, which were unsuitable for interpretation. Near the area of the shooting, officers found 10 nine-millimeter cartridge cases, a pair of black latex gloves, and three discharged cartridge cases.[2] The Springfield firearm had fired the 10 cartridge cases found at the crime scene. The black gloves had gunshot residue on them.

When Hernandez woke up later that day, he noticed Nike shoes, a black hat, and a light blue long-sleeved shirt that did not belong to him or his roommate. He also noticed that his boots, jacket, T-shirt, hat, pants, wallet, and gold necklace were missing. Later that night, Hernandez saw a story on the news involving a man who was wearing his jacket and pants. Orduno's DNA was found on the hat, shirt, and left shoe that he left in Hernandez's apartment, and gunshot residue was found on the shoes he left.

---

[2] These three discharged cases were from the officers' firearms.

4

A few days after Orduno was arrested, he called his mother while in custody. During the call, Orduno's mother mentioned potentially asking a detective to retrieve a surveillance video from a laundromat across the street from the shooting. Orduno instructed his mother not to do so. When his mother asked why, Orduno answered, "you already know." Orduno's mother never spoke to the detective about the video.

**Defense case**

Daniel Walters, a crisis intervention worker at the Gang Reduction Youth Development, testified on Orduno's behalf. Walters met Orduno when he was 13 years old and enrolled him in their program. Walters opined that Orduno is not a gang member. He also testified that many people who tag are not gang members.

## DISCUSSION

I. **The trial court did not abuse its discretion in concluding Orduno's motion to discharge retained counsel was untimely**

A. **Applicable Law and Standard of Review**

The Sixth Amendment guarantees a defendant's right to retain counsel of their choice. (*People v. Maciel* (2013) 57 Cal.4th 482, 512 (*Maciel*).) This right "reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*).)

The right to discharge counsel, however, is not absolute. (*Maciel, supra,* 57 Cal.4th at p. 512.) A trial court has wide discretion to deny a motion to discharge counsel if discharge would prejudice the defendant or is untimely. (*Ortiz, supra,* 51 Cal.3d at p. 983.) Such a motion is untimely if discharge would

unreasonably disrupt "the orderly processes of justice." (*Id*. at p. 983.) A defendant seeking to discharge retained counsel—as opposed to appointed counsel—is not required to demonstrate that counsel is providing inadequate representation or that they are "embroiled in irreconcilable conflict." (*Id*. at p. 984.) The trial court must consider the totality of the circumstances in deciding whether the defendant's motion is timely, which can include the absence of these factors. (*Maciel*, at p. 513.)

A defendant's right to choose a particular attorney is limited by the countervailing state interest in " 'proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time." ' " (*Ortiz*, *supra*, 51 Cal.3d at pp. 983–984.) The trial court "must balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution." (*People v. Lara* (2001) 86 Cal.App.4th 139, 153.)

We review a trial court's denial of a request to discharge retained counsel for abuse of discretion. (*People v. Lopez* (2018) 22 Cal.App.5th 40, 47 (*Lopez*).) A trial court abuses its discretion when it exercises that discretion in an arbitrary or absurd manner, resulting in a miscarriage of justice. (*People v. Johnson* (2022) 12 Cal.5th 544, 605–606 (*Johnson*).) "The erroneous denial of a defendant's right to discharge retained counsel is presumptively prejudicial and automatically requires reversal." (*Lopez*, at p. 47.)

## B. Trial Court Proceedings

### 1. Proceedings that preceded Orduno's request to discharge retained counsel

In April 2020, Orduno, who was represented by the public defender's office at the time, pleaded not guilty to all counts.

Four months later, on August 26, 2020, Orduno retained Louisa Pensanti to represent him. In 2021, Pensanti represented Orduno at his preliminary hearing.

The following year, Pensanti requested continuances at three pretrial conferences in August, October, and November. At the November 2022 pretrial conference, Pensanti advised the trial court that all discovery was complete, and specifically, that "all videos [had been] provided to their expert for a review." The court warned that no further continuances would be granted. At Pensanti's request, the matter was set for a jury trial readiness hearing on January 24, 2023, "as day 0 of 10 with a final time waiver."

At the trial readiness hearing, Pensanti requested another continuance, citing a discovery issue. Pensanti was seeking an original, unaltered version of a residential surveillance video that identified Orduno. This video was introduced at the preliminary hearing. Pensanti suggested the video had been "compromised." The trial court denied the request, noting Pensanti had confirmed that all discovery was completed two months prior and set the matter for trial assignment for January 30, 2023 "as day 6 of 10."

On January 30, 2023, Pensanti filed a supplemental motion to continue, asking the trial court to afford her "an adequate amount of time in which to have the video evidence properly processed and prepare for trial." The People countered:

7

> As of last week, we were here for 0 of 10.  The motion to continue was denied.  We started serving civilian witness[es] to come to court, expending money and time to prepare for the witnesses that we subpoenaed.  As far as the civilians and law enforcement, they are now under subpoena, and we are ready for trial.

After hearing from both parties, the trial court denied Pensanti's motion to continue.

### 2. Orduno's request to discharge retained counsel

Later that same day, the trial court granted Orduno's request for a *Marsden*[3] hearing and excused the prosecutor.  During the closed proceeding, the trial court denied Orduno's request to discharge Pensanti.  After the *Marsden* hearing, in open court, Orduno indicated he wished to represent himself, but that he would need a continuance in order to do so.  Noting that the case had been on a no further continuances status for several months, the trial court denied Orduno's request to represent himself without prejudice, concluding it was untimely.

The next day, the trial court clarified that a *Marsden* hearing is "not the traditional way to have private counsel relieved."  The court then asked Orduno whether he was seeking to discharge Pensanti in exchange for a public defender or private attorney or whether he wanted to represent himself.  Orduno answered that he wished to discharge Pensanti and be given a court-appointed attorney.  He also stated that he had not previously sought to discharge Pensanti, seek different counsel, or represent himself.  When asked why he had not done so, Orduno explained that he did not know trial was "going to start

---

[3]     *People v. Marsden* (1970) 2 Cal.3d 118.

any time soon."  He also stated he was not agreeing to go to trial. He further explained that he wanted to have new counsel appointed because he was "hoping . . . there might be something different going on except [him] going to trial."  He stated that he was aware if his request was granted, a new attorney would need time to prepare for trial.  He did not make the request sooner because trial had not started yet.

The trial court noted that no further continuances would be granted as of November 7, 2022.  Additionally, approximately 17 witnesses would be called in this case (15 prosecution witnesses and two potential defense witnesses), a panel of 72 potential jurors were already waiting at the court, and the trial was anticipated to last 12 court days.  The People also explained that they had been ready for trial "for quite some time," and although the defense had requested numerous extensions, the People had requested none.  The trial court reiterated its denial as follows:

> I'm going to stand by my previous denial of your request to discharge Ms. Pensanti.  The court is finding that the request is untimely and would result in a disruption of the orderly processes of justice under these circumstances. Specifically, it would cause undue delay at significant public expense.  And these are the findings made according to People versus Ortiz, 51 Cal.3[d 975] . . . at page 983.  So, again, [Orduno]'s request is denied.

Later that afternoon, jury selection began, and a jury was empaneled to try the case.  Trial began the next day on February 1, 2023.  Twenty witnesses testified at trial, including 19 prosecution witnesses and one defense witness.

### C. Analysis

#### 1. The trial court applied the correct standard in denying Orduno's request to discharge retained counsel as untimely, and the ruling was not an abuse of discretion

Orduno's argument is premised on the following assertion: "Cases uniformly hold that a motion to discharge [retained counsel] is timely if made before jury selection and there is no evidence the defendant made the motion for an improper motive, namely to disrupt the proceeding." None of the cases Orduno cites for this proposition contain any such bright line rule. The test is broader and more malleable than Orduno asserts—courts have discretion to deny motions to discharge retained counsel as untimely based on the totality of the circumstances. (See *Ortiz*, *supra*, 51 Cal.3d at pp. 983–984; *Lopez*, *supra*, 22 Cal.App.5th at p. 47; *Maciel*, *supra*, 57 Cal.4th at p. 513.) That is what the trial court did here, and it did so properly based on legitimate concerns that granting the motion would unreasonably disrupt the orderly process of justice. (*Ortiz*, at p. 979.)

Those legitimate concerns included the fact that Orduno made his request on the eve of trial, when the case had been pending for over two years, and several months after the court ordered no further continuances. The court emphasized that a panel of 72 potential jurors were awaiting jury selection, the jury would soon be empaneled, the People's witnesses had already been subpoenaed, and the trial was anticipated to last 12 court days. Moreover, because any new appointed or retained lawyer would need to learn about the case from scratch and Orduno was not seeking to represent himself, he was effectively seeking an indefinite continuance.

10

Orduno only articulated two reasons why he wanted to discharge his lawyer. He first explained that he sought to discharge his counsel so that "there might be something different going on except [him] going to trial." His desire not to go to trial was not a legitimate reason to grant his request to discharge his lawyer on the eve of trial.

Orduna also complained that his retained counsel was unprepared and incompetent because she did not prepare an expert to review residential video surveillance. About a week before trial, counsel attempted to assert the residential video surveillance evidence was somehow "compromised." She also sought a continuance of the trial on the ground she needed more time for her video expert to review the raw "uncompromised" footage.

In response to this request for a continuance, the trial court reviewed the relevant history of the case, including past discussions about the video. The court explained that it understood Orduno's claim the video was "compromised" to mean that the prosecution was using the video in a converted format rather than the "raw" video.

The prosecutor explained how and why the video was converted—so that it could be played on different devices with different software—and that he had directly shared the video with the defense expert via an evidence-sharing platform. The prosecutor made clear that the conversion process did not entail the editing or changing of the raw material contained in the video. The prosecutor further noted that the video in question had already been introduced at the preliminary hearing a year prior without issue. Nothing in the record contradicts the

prosecutor's assertions; Orduno's concern about the integrity of the video was speculative.

The trial court's decision to not discharge retained counsel a week before trial due to her alleged incompetence was not arbitrary or absurd. The video had already been admitted at the preliminary hearing, and the prosecution clarified how and why the video had been converted, noting that the conversion process did not alter the contents of the video. Balancing Orduno's desire to discharge allegedly incompetent counsel and the disruption of the orderly process of justice, the court rejected Orduno's request to discharge his counsel. We discern no abuse of discretion under these circumstances.

In arguing the trial court abused its discretion, Orduno relies heavily on *People v. Hernandez* (2006) 139 Cal.App.4th 101 (*Hernandez*). In his reply brief, he asserts "*Hernandez* is controlling and reversal is required pursuant to that opinion." *Hernandez*, however, is of no assistance to Orduno. In *Hernandez*, a different panel of this court reversed the judgment, concluding the trial court erred in denying Hernandez's request to discharge retained counsel prior to trial, and the error required automatic reversal. (*Id.* at pp. 104, 109.) The *Hernandez* court reversed based on two errors by the trial court, neither of which are present in Orduno's case. First, the trial court in *Hernandez* incorrectly applied a *Marsden* analysis, which was inapplicable because Hernandez was requesting to discharge retained counsel. (*Hernandez*, at pp. 108–109.) Second, the trial court in *Hernandez* did not adequately address the issue of delay. (*Hernandez*, at p. 109.) As we explain in the following two sections, the trial court did not make the same errors here.

12

We reject Orduno's contention that reversal is required under *Hernandez*.[4]

Nor are we persuaded by Orduno's argument that reversal is warranted under *Lopez*. There, the Court of Appeal reversed the denial of the defendant's motion to discharge retained counsel in part because the trial court did not adequately analyze whether discharge would unduly disrupt the orderly process of justice. (*Lopez, supra*, 22 Cal.App.5th at pp. 49–50.) "[T]he only inquiry the trial court made was into how long [retained counsel] had represented Lopez and whether [retained counsel] had been retained for trial, and it did not explicitly weigh any concerns about the case's progress against Lopez's right to discharge his retained attorney." (*Id.* at p. 49.) *Lopez* is inapplicable here because the trial court made no such error in denying Orduno's motion to discharge counsel. The court properly asked Orduno and the prosecution questions that were relevant to assessing the timeliness of Orduno's request, then reasonably denied the request as untimely under the circumstances.

Lastly, in arguing the trial court erred by denying his request to discharge retained counsel, Orduno points out that she has a history of being disciplined by the State Bar. Orduno concedes, however, that the trial court was never made aware of counsel's disciplinary record. Orduno cites no authority suggesting that a trial court has a sua sponte duty to investigate a private attorney's disciplinary history when a criminal

---

[4]     Citing *Hernandez* at page 109, Orduno asserts: "Unless there is evidence the defendant made the motion to discharge his retained attorney based on improper motive, to delay or disrupt proceedings, the motion must be granted." Nothing in *Hernandez* supports Orduno's position.

defendant makes a motion to discharge that attorney. We reject Orduno's argument that the trial court erred by not considering counsel's undisclosed disciplinary history.[5]

## 2. The trial court's inquiry into the timeliness of Orduno's request was sufficient

Orduno also argues the trial court "made [an] insufficient inquiry" into whether discharging retained counsel would disrupt the orderly process of justice. Relatedly, he contends the court failed to balance Orduno's interest in discharging counsel against whether the request would unreasonably disrupt the orderly processes of justice. These claims are belied by the record.

After allowing Orduno to express his concerns over the video evidence, the court sufficiently inquired into the timeliness of Orduno's request to relieve counsel. The court confirmed with both Orduno and his attorney that she had represented him since August 2020, and confirmed with Orduno that he had not previously attempted to discharge counsel, find different counsel, or request to represent himself. The court also noted the procedural history of the case, explaining that Orduno had been arraigned in December 2021, and that no further continuances would be granted as of November 7, 2022. The court then reviewed in detail the number of witnesses prepared and jurors summoned and confirmed with the prosecution that it had announced it was ready for trial in January. The court also asked Orduno why he wished to discharge his counsel at that time and why he had not requested to discharge his counsel earlier.

---

[5]     Although this has no impact on our analysis, it bears noting that Orduno does not make any assertions on appeal that his private attorney rendered ineffective assistance.

14

On these facts, we conclude the trial court made adequate inquiries into Orduno's request and properly balanced his interest in discharging counsel against the concern that granting the request would unreasonably disrupt the orderly processes of justice. (*Ortiz*, *supra*, 51 Cal.3d at p. 983.)

### 3. **The trial court did not erroneously conduct a** *Marsden* **analysis**

Orduno argues the trial court erroneously conducted a *Marsden* analysis. In *Marsden*, our Supreme Court held that a defendant is deprived of effective assistance of counsel when the trial court denies his motion to substitute one appointed counsel for another without giving him an opportunity to state the reasons for his request. (*Marsden*, *supra*, 2 Cal.3d at p. 123.) Subsequent cases have held that a defendant cannot substitute one appointed counsel for another unless he either demonstrates inadequate representation by his appointed attorney or identifies an irreconcilable conflict with counsel. (*Ortiz*, *supra*, 51 Cal.3d at p. 984.) In *Ortiz*, the high court held that a different analysis applies when the defendant seeks to discharge retained counsel. (*Ibid.*)

Here, it is true the trial court granted Orduno's request for a "*Marsden* hearing." But the following day, in open court, the court clarified that a *Marsden* hearing is "not the traditional way to have private counsel relieved." The court then cited *Ortiz* and conducted its analysis under that case. Contrary to Orduno's assertion, the trial court did not erroneously conduct a *Marsden* analysis.

## II.    The trial court's denial of Orduno's request to represent himself is not a basis for reversal of the judgment

Orduno next argues the trial court committed reversible error when it denied his *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) motion to represent himself.  We disagree for several reasons.

First, although Orduno initially made a *Faretta* motion in the trial court, he abandoned that motion the following day when he clarified that he wished to be represented by appointed counsel rather than represent himself.  By withdrawing his *Faretta* motion in the trial court, Orduno forfeited the right to challenge the denial of that motion on appeal.  (See *People v. Skaggs* (1996) 44 Cal.App.4th 1, 8 (*Skaggs*) [defendant's failure to thoroughly pursue his *Faretta* motion in the trial court constituted abandonment and forfeiture of his right to self-representation]; *People v. Kenner* (1990) 223 Cal.App.3d 56, 62 (*Kenner*) ["[W]here [a defendant] had both time and opportunity to follow up on his request for a hearing on his *Faretta* motion, and failed to do so, he must be deemed to have abandoned or withdrawn that motion"]; *People v. Dunkle* (2005) 36 Cal.4th 861, 909 [citing *Skaggs* and *Kenner* with approval].)  We reject Orduno's *Faretta* argument on that basis.

Second, even assuming Orduno had not abandoned his *Faretta* motion, the trial court acted within its discretion when it denied Orduno's *Faretta* motion as untimely.  "Although a defendant has a federal constitutional right to represent himself [citation], in order to invoke an unconditional right he must assert it ' "within a reasonable time prior to the commencement of trial." ' "  (*People v. Frierson* (1991) 53 Cal.3d 730, 742

16

(*Frierson*).)  "A motion made after this period is addressed to the sound discretion of the trial court." (*Ibid.*)  The court should consider such factors as the " 'quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " (*People v. Burton* (1989) 48 Cal.3d 843, 853.)

Upon reviewing the trial court's analysis of these factors, we conclude the trial court acted within its "sound discretion" (*Frierson, supra*, 53 Cal.3d at p. 742) to deem Orduno's *Faretta* motion untimely.  Orduno made his *Faretta* motion right before trial and he was unprepared to take over his trial when he made his motion.  Orduno would have needed an indefinite continuance to represent himself.  Appellate courts have consistently held *Faretta* motions made under analogous circumstances may reasonably be deemed untimely.  (See, e.g., *People v. Lynch* (2010) 50 Cal.4th 693, 722 ["[W]e have held on numerous occasions that *Faretta* motions made on the eve of trial are untimely"]; *People v. Frierson, supra,*53 Cal.3d 742 [*Faretta* motion untimely when made two days before trial]; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1204–1205 [*Faretta* motion untimely when made four days before trial was set to begin].)

Finally, assuming Orduno had not abandoned his *Faretta* motion, any purported error in denying the untimely motion would have been harmless.  Whereas the erroneous denial of a timely *Faretta* motion is reversible per se (*People v. Joseph* (1983) 34 Cal.3d 936, 948), the erroneous denial of an untimely *Faretta* motion is reviewed for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Rogers* (1995) 37

17

Cal.App.4th 1053, 1058.) Applying the *Watson* standard, we conclude Orduno cannot satisfy his burden of demonstrating it is reasonably probable he would have obtained a more favorable outcome at trial had he represented himself. We reach this conclusion in light of the very strong evidence of Orduno's guilt presented at trial.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

TAMZARIAN, J.

We concur:

ZUKIN, P. J.

COGLIATI, J.*

---

\* Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18